32-10/MEU/SL

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff-Petitioner
GALSWORTHY LIMITED
80 Pine Street
New York, New York 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger
Susan Lee

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

GALSWORTHY LIMITED,                                    10 Civ. _____ (___)

        Plaintiff-Petitioner,

                                              **VERIFIED PETITION**
                                              **TO CONFIRM**
v.                                          **<u>ARBITRAL AWARD</u>**

GLORY WEALTH SHIPPING PTE LTD,

        Defendant-Respondent.
-------------------------------------------------------------x

        Plaintiff-Petitioner GALSWORTHY LIMITED (hereinafter the "Petitioner"), by its

attorneys FREEHILL HOGAN & MAHAR LLP, as and for its Verified Petition to confirm and

enforce a foreign arbitral award rendered against Defendant-Respondent GLORY WEALTH

SHIPPING PTE LTD (hereinafter "Respondent"), alleges upon information and belief as

follows:

        1.      This is an action within the Court's admiralty and maritime jurisdiction pursuant

to 28 U.S.C. §1333 and constitutes a maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves the recognition, confirmation and

enforcement of a foreign arbitral award relating to the breach of a maritime contract of charter

party. This matter also arises under the Court's federal question jurisdiction within the meaning

of 28 U.S.C. §1331 and the New York Convention on the Recognition and Enforcement of

345100.1

Foreign Arbitral Awards (9 U.S.C. §§ 201, *et seq.*) and the Federal Arbitration Act (9 U.S.C. §§ 1, *et seq.*).

2.      At all times material hereto, Petitioner was and still is a foreign corporation duly organized and existing under the laws of Liberia.

3.      At all times material hereto, Respondent was and still is a corporation or other business entity duly organized and/or existing under the laws of Singapore, and is registered to do business in the State of New York with the NYS Department of State, Division of Corporations, pursuant to N.Y. B.C.L. §§ 1300, *et seq.*, with a registered agent located in the Southern District of New York in care of CT Corporation System, 111 Eighth Avenue, New York, NY, 10011. A true and accurate printout of Respondent's proof of New York Registration (available at: http://www.dos.state.ny.us/corps/bus_entity_search.html) is annexed hereto as **Exhibit 1**.

4.      Under a charter party dated May 7, 2008, Petitioner, as disponent owner of the M/V JIN TONG, agreed to let, and Respondent, as charterer, agreed to charter, the M/V JIN TONG for a period of a minimum of 16 months to a maximum of 63 months. A true and accurate copy of the charter party is annexed hereto as **Exhibit 2** (hereinafter the "Charter Party").

5.      The Charter Party provided for the resolution of disputes to be referred to arbitration in London. (*See*, Ex. 2 at Clauses 17 and 91).

6.      The vessel was duly delivered by Petitioner into the service of Respondent, who subsequently breached the Charter Party.

7.      As a consequence of Respondent's breach of the Charter Party, claims arose and pursuant to the terms of the Charter Party, Petitioner commenced arbitration proceedings in

London, appointed Bruce Harris as arbitrator, and duly called upon GLORY WEALTH to respond by appointing its arbitrator. Respondent appointed Mr. Patrick O'Donovan. Messrs. Harris and O'Donovan, in turn, appointed Mr. Alan Oakley as third arbitrator.

8.      The claims submitted by Petitioner included unpaid hire during the period of performance and damages suffered as a consequence of Respondent's breach of the Charter Party.

9.      Respondent served defense submissions on Petitioner denying liability for Petitioner's claims and advancing counterclaims for alleged overpayment and loss of profit damages.

10.      The arbitral panel, having carefully and conscientiously reviewed and considered the submissions of the parties and the documents put before them, and having given due weight thereto, made, issued and published a Final Award dated October 14, 2009, holding in favor of Petitioner and against Respondent in the total sum of USD 40,508,151.85 (Forty million, five hundred and eight thousand one hundred and fifty-one United States Dollars and eighty-five cents), together with interest thereon at the rate of 4.50% per annum compounded at three-monthly rests from January 1, 2009 until the date of payment. A certified copy of the Award issued on October 14, 2009 by arbitrators Bruce Harris, Patrick O'Donovan and Alan Oakley is annexed hereto as **Exhibit 3** and provides the specific details regarding the claims, the assessment of liability and the calculation of the Final Award (hereinafter the "Award").

11.      The Award also provides for Respondent to bear its own and Petitioner's costs plus interest thereon at the rate of 4.50% per annum compounded at three-monthly intervals from October 14, 2009 until the date such costs are paid.[1]

---

[1] Petitioner's total recoverable costs under the Award have not yet been assessed, and Petitioner reserves its right to amend this Petition or otherwise apply to this Court for an award of such recoverable costs under the Award.

12.    In addition, the Award further provides for Respondent to bear the costs of the Award in the sum of £ 9,680.00, provided that if, in the first instance, Petitioner shall have paid any amount in respect of the costs of the Award Petitioner shall be entitled to immediate reimbursement from Respondent of the sum so paid, plus interest thereon at the rate of 4.50% per annum compounded at three-monthly intervals from the date of Petitioner's payment until the date of reimbursement by Respondent.

13.    On October 23, 2009, Petitioner paid the full costs of the Award (£ 9,680.00, equivalent to USD 15,851.87, as calculated by an exchange rate of 1 £ to 1.63759 USD then-existing on October 23, 2009, *see Historic Exchange Rates* at: http://www.x-rates.com) to the arbitral panel.  Despite due demand, Respondent refused or otherwise failed to reimburse Petitioner the sum paid, and thus the entire amount of USD 15,851.87, plus interest presently recoverable by Petitioner in the amount of USD 402.24 (up to June 7, 2010, which shall continue to accrue until the date such reimbursement is paid by Respondent),  remains unpaid and owing to Petitioner.

14.    To date, and in bad faith, Respondent has failed and/or refused to honor or satisfy the Award.

15.    As the Award also adjudged that Respondent shall pay interest on the principle sum of USD 40,508,151.85 at the rate of 4.50% per annum compounded at three-monthly rests from January 1, 2009 until the date such principle sum is paid, interest on the principle sum that is presently recoverable by Petitioner totals USD 2,682,987.59 (up to June 7, 2010) and such interest shall continue to accrue until the date the principle sum is paid by Respondent.

16.    Pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention"), 9 U.S.C. §201, *et seq.*, and the Federal

Arbitration Act, 9 U.S.C. §1, *et seq.*, Petitioner seeks an Order confirming the Award as rendered by the London arbitral panel, and reduction of that Award to a judgment of this Court for the purpose of enforcement.

17.    Petitioner also seeks an award of fees and costs incurred in this action as the bad faith refusal to honor the Award by Respondent created a needless waste of judicial and counsel resources all of which are properly recoverable under this Court's admiralty and maritime jurisdiction.

WHEREFORE, Petitioner prays:

a.    that process in due form of law according to the practice of this Court may issue against Respondent citing it to appear and answer or be defaulted for the relief sought herein; and

b.    that this Court recognize, confirm and enforce the Final Award issued on October 14, 2009 in London, pursuant to the New York Convention and 9 U.S.C. §201 *et. seq.* and the Federal Arbitration Act 9 U.S.C. §1 *et. seq.,* and the doctrine of comity in the total amount of the Final Award, USD 40,508,151.85, together with interest and costs as set forth therein; and

c.    that this Court award Petitioner its attorneys' fees and costs incurred in the prosecution of this Petition; and

d.     that Petitioner have such other and different relief as this Court may deem

just and proper in the premises.

Dated:   New York, New York
          June 8, 2010

                     FREEHILL HOGAN & MAHAR LLP
                     Attorneys for Plaintiff-Petitioner
                     GALSWORTHY LIMITED

By:_____

                     Michael E. Unger
                     Susan Lee
                     80 Pine Street
                     New York, New York 10005
                     (212) 425-1900
                     (212) 425-1901 fax

# Exhibit 1

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through June 7, 2010.

---

Selected Entity Name: GLORY WEALTH SHIPPING PTE. LTD.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | GLORY WEALTH SHIPPING PTE. LTD. |
| **Initial DOS Filing Date:** | OCTOBER 16, 2008 |
| **County:** | NEW YORK |
| **Jurisdiction:** | SINGAPORE |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O CT CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Registered Agent**

CT CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

This office does not record information regarding
the names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

\*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| OCT 16, 2008 | Actual | GLORY WEALTH SHIPPING PTE. LTD. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

<u>Search Results</u>          <u>New Search</u>

<u>Services/Programs</u>  |  <u>Privacy Policy</u>  |  <u>Accessibility Policy</u>  |  <u>Disclaimer</u>  |  <u>Return to DOS</u> <u>Homepage</u>  |  <u>Contact Us</u>  |  <u>Web Feedback</u>

# Exhibit 2

bít 1 - 1(B)

---

Carol Chan
_____

寄件者:     "Carol Chan" <carol@jinhuiship.com>
收件者:     "HOWE ROBINSON" <hrs.hdy@howerobinson.com>
傳送日期:   2008年5月14日 上午 10:35
主旨:       M/V "JIN TONG" - GLORY WEALTH - CP 7/MAY/2008

FM : GOLDBEAM HKG          14-MAY-2008          REF. CC051402

TO : HOWE ROBINSON / FRANK PLEASE

RE : M/V "JIN TONG" - GLORY WEALTH - CP 7/MAY/2008

FYI.

OWNERS FULL STYLE : GALSWORTHY LIMITED AS DISPONENT OWNERS

BANK DETAILS :

PLEASE ARRANCE THE REMITTANCE I
TO THE FOLLOWING BANK A/C :


IN FAVOUR OF :
FOR CREDIT OF :
WITH MESSAGE: I




+++


PLEASE DESPATCH SUBJECT WORKING C/P TO US ASAP


B.REGARDS
CAROL
EMAIL: carol@jinhuiship.com

2008/5/14

Ben Lam
_____

寄件者:     "Norman Wu" <norman@jinhuiship.com>
收件者:     "Frank Lo" <frank@howcrobhk.com.hk>
副本:       "Thomas Ng" <th@jinhuiship.com>; "Ben Lam" <ben@jinhuiship.com>
傳送日期:   2008年5月9日 下午 04:46
主旨:       SPEED

FM GOLDBEAM HK

FRANK/NORMAN

JIN SUI/JIN TONG - GLORY WEALTH

VIEW THE ABOVE VSLS ARE NB OWNS WISH TO ADD FLWG:

- HIRE ADJUSTMENT CLAUSE
THE VSL IS A NEWBUILDING, THE SPEED AND CONSUMPTIONS GIVEN ARE ESTIMATED
WHICH ARE TO BE ADJUSTED AFTER 180 DAYS AFTER DELIVERY. IF THE VSLS AVERAGE
SPEED IS HIGHER OR LOWER THAN 0.5 KNOTS AT DECLARED SPEED OR, THE AVERAGE FUEL
CONSUMPTIONS ARE HIGHER OR LOWER THAN 5 PCT ALLOWED AT DECLARED
CONSUMPTIONSPEED, THE TIME CHARTER HIRE TO BE ADJUSTED PRO RATA AND THE MUTUALLY
AGREED REVISED SPEED AND CONSUMPTION WILL BE APPLIED ON THE BALANCE PERIOD.
THE VESSEL WILL NOT BE SUBJECT TO ANY PERFORMANCE CLAIM FOR THE 1ST 180 DAYS
AFTER DELIVERY.

PLS ADV/CNFM

BRGDS

**Ben Lam**

| | |
|---|---|
| 寄件者: | "Frank Lo" <fixwithfrank@hotmail.com> |
| 收件者: | <ben@jinhuiship.com> |
| 傳送日期: | 2008年5月8日 下午 04:17 |
| 主旨: | Goldbeam 2x57K Dolphin NB/GWS |

BEN/FRANK-JESSY

RE: Goldbeam 2x57K Dolphin NB/GWS
==

Asp telconv, Ownrs & Chtrs hv mutually agreed asf :

- Laycan :

OWRS WL GIVE CHRS NOT LESS THAN 45/30/20 DAYS APPROXIMATE NOTICE OF
VESSEL'S EXPECTED DATE OF DELY AND 10/7/5/3/2/1 DAYS NOTICE OF DELY.
OWRS TO NARROW 13 DAYS SPREAD L/CAN TOGETHER WITH 30 DAYS DELY NOTICE.

- Bunker Price: USD550pmt for IFO + USD950pmt for MDO

end.

B.RGDS

--------------------------------------------------------------------

Get news, entertainment and everything you care about at Live.com. Check it out!

2008/5/8

Ben Lam
_____

寄件者:    "liurui" <jessy0414@hotmail.com>
收件者:    <ben@jinhuiship.com>
傳送日期:  2008年5月8日 下午 01:28
附加檔案:  TIME CHARTER.PDF
主旨:      GOLDBEAM 2 X DOLPHIN 57K NB/GWS - CLEAN RECAP(corrected copy) - C/P DD 7TH MAY, 2008


Ben / Jessy + Frank


RE: GOLDBEAM 2 X DOLPHIN 57K NB/GWS - CLEAN RECAP(corrected copy)
    (C/P DD 7TH MAY, 2008)
==


MANY THANKS FOR YR GREAT SUPPORT SO FAR.


PLSD TO RECAP FULL TERMS MUTUALLY AGREED ASF:


- All nego and eventual fixture to be kept top pnc


- VSL'S DESCRIPTION:


'dolphin type'
SDBC HK 08
57000 dwt bulk carrier on 12,82 m ssw
5 HH 71,500 cbm grain, including hatch coamings
class ABS
4 x 35 mts cr + 4 grabs X 12.50 cbm
189,99 / 32,26 m loa / beam
gt / nt abt 32300 / abt 18700
abt 14,2 kn UNDER GOOD WEATHER CONDITION on ABT 31mts IFO MAX 180 cst
+ ABT 1.9MT IFO
VSL WL BURN ABT 1.9MT MDO DAILY FOR THE ABT 1ST 30 DS


( ALL DTLS ABT/WOG N SUBJ TO YARD FINAL CONFIRMATION )


FOR


- A/C GLORY WEALTH SHIPPING PTE LTD


- DELY EX YARD SHANGHAI SHIPYARD ATDNSHINC


HULL NO. SS1147 TBN 'JIN SUI'
HULL NO. SS1148 TBN 'JIN TONG'


- LAYCAN:

第 2 - 4(B)

```
1ST VSL, LAYCAN 15TH AUG - 30TH SEP, 2008 (INT DELY DATE O/A 18TH AUG,
2008 WOG)
2ND VSL, LAYCAN 25TH OCT - 30TH NOV, 2008 (INT DELY DATE O/A 28TH OCT,
2008 WOG)
LAYCAN TB NARROWED
```

- T/C OF MIN/MAX 60/63 MONS

- HIRE USD35,500 DIOT FOR EACH VSL

- NO ADD COMM + 1.25PCT TO HOWE(PAID BY OWNRS)

- Otherwise bss attached Ownrs prfm c/p with logical amendments asp
m'terms agreed except flwg :

Cl 60: Cargo exclusion:

Insert: " Max 1 Chilean rock salt per annum, which against Ownrs
protective clause:

```
CHILEAN ROCK SALT PROTECTIVE CL.
--------------------------------------
CHARTERERS ARE PERMITTED TO CARRY CARGO OF ROCK SALT,
WHETHER IT BE FULL OR PART CARGO, CHARTERERS GUARANTEE MAXIMUM
MOISTURE CONTENT NOT EXCEEDING 0.075 PCT. AFTER DISCHARGE
CHARTERERS TO SUPPLY SUFFICIENT FRESH WATER AT THEIR EXPENSE
FOR WASHING DOWN OF ALL HOLDS. ANY EXTRA EXPENSES RESULTING
THEREFROM/INCURRED THEREBY (SUCH AS HOLD CLEANING TO MASTER'S
SATISFACTION/HOLD SURVEY ETC) AND ANY DETENTION THROUGH ANY OF
ABOVE CAUSES TOBE FOR CHARTERERS'S ACCOUNT.
THE LIBERTY GRANTED TO CHARTERERS HEREIN IS SUBJECT TO CHARTERERS'
GUARANTEE THAT THE ABOVE-MENTIONED COMMODITIES WILL BE NOT CARRIED
IN CONSECUTIVE SHIPMENTS/VOYAGES. OWNERS HAVE RIGHT TO WITHDRAW THE
LIBERTY GRANTED TO CHARTERERS HEREIN IN CASE OF ANY BREACH OF ABOVE
BY CHARTERERS. "
```

After " which same not to be on consecutive voyages", insert " but
agree max one consectutive voyages per annum."

Bulk petcoke owners protective cl: (B)insert "green delay petcoke"
after "calcined type"

Insert " Vessel has cement hole on board."

Cl 67: Trading exclusion:

Delete " Nigeria "

.b頁 3 - 4(B)

and insert:

" Owners will consider direct trading between Taiwan ports and China
mainland ports when it becomes lawful as between these two places and
will not bring any risk and extra expense to the crew, vessel and
Owners. Owners' approval is not to be unreasonably withheld. "


Cl 103. Off-hire Add-UP


To read as " The Charterers may in their option, add to the time
charter period, partly or wholly, any off-hire period(s), which to be
declared prior minimum charter period two months ago."


++


Insert additional clause:


Grab clause:


Owners guarantee Grab is suitible for loading and discharging iron ore
asp m'terms described, and Charterers is free to use grab on board.
- END -


KINDLY CONFIRM ALL ABV IN ORDER BY RETURN PLS


MANY THANKS AGAIN.


Thanks + Best regards
Jessy Liu
Howe Robinson Shipbrokers - Shanghai Office
REP: 86 - 21 - 3318 - 4550
DIR: 86 - 21 - 6391 - 8422
MOB: 86 - 13501260576
EMAIL: hrs.hdy@howerobinson.com
MSN: jessy0414@hotmail.com


2008/5/8

b頁 4 - 4(B)

Windows Live Writer，支持离线撰写博客内容，随时随地想写就写。 立即使用！

"七件武器，七种完美" 立刻体验！

*HOWE ROBINSON & CO LTD*
**★ SHIP BROKERS ★**
*77 MANSELL ST. LONDON E1 8AF*

# Time Charter

### GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   **This Charter Party**, made and concluded in *Hong Kong* ................................................*7th* ..... day of *May* ..................... 19 *2008*

2   Between *GALSWORTHY LIMITED* ...................................................................................................*as Disponent* .......................

3   Owners of the good *Hong Kong* ...................... Steamship/Motorship *"JIN TONG" HULL NO SS1148 - See Description Clause 45* of .......

4   of ................................... tons gross register, and ............................... tons net register, having engines of ............................................... indicated horse power

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed .............................................................................................

6   at ...... .................... of about *71,500* ................... cubic *metres grain* feet bale capacity *in holds*, and about *57,000 metric* ............... tons of 2240 lbs.

7   deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,

8   allowing a minimum of fifty tons) on a draft of *12,82 metres* feet ............................ inches on salt............. Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about ................................................................................ tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions *throughout the currency of this Charter Party* about *14.2*... knots on a consumption of about *31 metric* tons of *IFO maximum 180 CST and bout 1.9 metric ton IFO vessel will burn about 1.9 metric tons MDO (see Clause 45)* best Welsh coal—best grade fuel oil—best grade Diesel oil,

11  now *trading* ..............................................................................................................................................................................

12  ................ and *GLORY WEALTH SHIPPING PTE* ..................................... Charterers of the City of *Singapore* .................. ...

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *period of 60 months / maximum 63 months via safe anchorage(s), safe berth(s), safe port(s), always afloat, always* ....................... within below

15  *accessible always within Institute Warranty Limits with bulk harmless / lawful cargo. (See Clause 106 /109)* mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations* hereunder.

18  Vessel to be placed at the disposal of the Charterers, at *delivery ex yard Shanghai shipyard, any time day or night, Sunday and holidays included I.E. tugs and pilots at Charterers account for bringing the vessel to open sea. Vessel's trading certificates including* ....

19  *SMC/ISPS/CLASS P and I / etc likely available only after vessel's physical delivered from the shipyard.*

20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be

22  ready to receive cargo with clean-swept holds *(see Clause 48)* and tight, staunch, strong and in every way fitted for the *ordinary cargo* service, having water ballast, winches and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes* winches at one and the same

24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25  dise, including petroleum and its products, in proper containers, excluding *See Clause 60*

26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29  Mexico, and/or South America .......................................................................................................................................... and/or Europe

30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic.

32  *Trading within Institute Warranty Limits (see Clause 67). Vessel to be employ in lawful trade for the carriage of lawful cargo.*

33  .....................................................................................................................................................................................

34  .....................................................................................................................................................................................

35  as the Charterers or their Agents shall direct, on the following conditions:

36  1.   That the Owners shall provide and pay for all provisions, wages *immigration* and consular shipping and discharging fees of the Crew; *also consular fees needed because of the vessel's nationality or flag and also garbage removal* shall pay for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *fresh water for drinking* boiler water and *lubricating* maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment for and during the service *with all certificates to comply with current requirements at the ports of call and for and during the service, failing which Owners are responsible for all time lost and expenses incurred thereby.*

39  2.   That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, *Canal Tolls, customary compulsory pilotages including Dardanelles / Bosporous and Torres Strait, Skaw, Japan inland seas,* Agencies, Commissions,

40  Consular Charges (except those pertaining to the Crew), *whilst vessel is on hire,* and all other usual expenses except those before stated, but when the vessel puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44  of six months or more.

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48  3.   That the Charterers, at the port of delivery, and the Owners, at the port of re delivery, shall take over and pay for all fuel remaining on

49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ .................... ~~tons and not more than~~

50 ................ ..... ~~tons and to be re-delivered with not less than~~ ................... ~~tons and not more than~~ ................. ~~tons.~~

51 4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD35,500 (thirty five thousand five hundred) daily*

52 *including overtime for each vessel payable every 15 days in advance*   United States Currency ~~per-ton on vessel's total deadweight carrying~~

~~capacity, including bunkers and~~

53 ~~stores, on~~ ................................ ~~summer freeboard, per Calendar Month;~~ commencing on and from the day *and time* of her delivery, as aforesaid, and at

54 and after the same rate for any part of a *days*; ~~month;~~ hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port Aden / Japan Charterers' option*

*Skaw / Passero Charterers' option Boston / Galveston port in Charterers' option anytime day or night, Sundays and holidays*

*included*

56 ............... unless otherwise mutually agreed. Charterers are to give Owners *approximate notice of redelivery area thence 25/20/15/10/7 days*

*approximate redelivery date and intended port thence 5/3/2/1 days definite notice of redelivery date and port* ~~not less than~~ ........ *days*

57 ~~notice of vessels expected date of re-delivery, and probable port.~~

58 5.    Payment of said hire to be made in New York in cash in United States Currency, *(see Clause 46/50) 15 days* semi-monthly in advance, and for

the last *15 days* ~~half month~~ ..., hire is to be paid for the balance day by day, as it becomes

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, *subject to Owners' prior approval* by the

Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68 6.    That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *and any safe anchorage* that

Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, *see also Clause 15* ~~except at such places where it is customary for similar size~~

~~vessels to safely~~

70 ~~lie aground.~~

71 7.    That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~

~~paying Owners~~ ................. .............. ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

74 

75 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers allowed.*

76 8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, and trim, *discharge and tally* the cargo, at their expense under the supervision of the Captain, who is to sign Bills of

Lading for

79 cargo as presented, in *strict* conformity with Mate's or Tally Clerk's receipts. *No through Bills of Lading to be issued during the currency of*

*this Charter.*

80 9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10    That the Charterers shall have permission to appoint a Supercargo, who shall ~~accompany the vessel and~~ see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, *if available,* and same fare as provided for Captain's table, Charterers paying at the

84 rate of ~~$1.00~~ *$5.00* per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying at the ~~current rate per meal.~~ *USD1,250 (one thousand two hundred and fifty dollars) per*

*month pro rata for all such cables / victualling / entertainment as per Clause 43.* ~~for all such victualling.~~

86 11.    *See Clause 30* ~~That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and~~

~~the~~

87 ~~Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-~~

88 ~~terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-~~

89 ~~sumption of fuel.~~

90 12.    That the Captain shall use diligence in ~~caring~~ *the care* for the ventilation of the cargo. *Vessel will be held responsible for any damage*

*to the cargo caused by inadequate ventilation or caused by water through ventilators and leakage of water and/or oil from pipes*

*and/or valves and/or tank etc on board, due to wear and tear of the above or any other cause.*

91 13    ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ...............................................

92 

93 ~~on giving written notice thereof to the Owners or their Agents~~ ...........................~~days previous to the expiration of the first named term, or any declared option.~~

94 14    That if required by Charterers, time not to commence before *25th October, 2008* ............................... and should vessel

95 not have ~~been delivered~~ given written notice of readiness on or before *30th November, 2008* ................... but not later than 4 p.m. Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness *(intention delivery date on / around*

*28th October, 2008 without guarantee) laycan to be narrowed.*

97 15.    That in the event of the loss of time from *default and/or* deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, *until the vessel has returned to the same or*

*equivalent position* and if upon the voyage the speed be reduced by



defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The Act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~New York~~ *London*, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. *English Law to apply.* The Arbitrators shall be commercial *shipping* men.

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules 1924 *1974, or amended 1990 at London.* ~~at such port or place in the United States as may be selected by the carrier, and in so matters-not provided for by these~~

~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.~~

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.~~ *Hire not to contribute to General Average.*

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be~~ agreed to as to quantity, and the cost of replacing same, to be allowed by Owners. *No deductions are to be made by Charterers for galley fuel.*

~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of hire to be suspended until she is again in proper state for the service~~

.....................................................................................................................

.....................................................................................................................

22. *Maximum in accordance with description Clause* ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The Charterers to have the use of any gear on board the vessel.~~ *Owners to provide sufficient light for night work as on board and to maintain same in efficient working order.*

23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging; ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck-hands and donkeymen for overtime work done in accordance with the working hours and rules stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned thereby.~~

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels; etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the *General Clause Paramount* following clauses, both
~~of which are to be included in all bills of lading issued hereunder:~~

~~U. S. A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

~~Both to-Blame Collision Clause~~

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-



168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Vessel not to follow ice breakers, not to force ice. Vessel is sailing in ice infested waters always to be for subject to Master's approval.*

170     26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters, same as when trading for their own account.

172     27. A commission of 2 1/2 *1.25* per cent is payable by the Vessel and Owners to *HOWE ROBINSON SHIPBROKERS* .... ...... ..... ..............
173 .....

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175     28. ~~An address commission of 2 1/2 per cent payable to~~................................................................ ...........on the hire earned and paid under this Charter.

Clauses *29 ........ to 115 .... inclusive Both to Blame Collision Clause, New Both to Blame Collison Clause, New Jason Clause, General Average and the New Jason Clause, Bimco Conwartime 2004* as attached hereto, are deemed to be fully incorporated in this charter party


Owners                                                                             Charterers

.... ...... ..... .... ....  ..... .......................                   .........................................................................


This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc.. using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



# M.V. "JIN TONG"
## CHARTER PARTY DATED 7th MAY, 2008
### ADDITIONAL CLAUSES

### Clause 29 – P and I Bunker Clause

The ship shall have the liberty as part of the contract voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter Party and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

### Clause 30

Charterers shall furnish the Master from time to time with all requisite instructions and sailing directions in writing or by telegram and the Master shall keep a full and correct Deck and Engine logs in English of the voyage or voyages showing inter-alia the course of the vessel and distance run and the consumption of fuel oil, which is to be patent to the Charterers or their Agents, a true copy of which is to be sent to Charterers from each port of call on the voyage and immediately after completion of the voyage, together with any other information which the Master deems necessary.

### Clause 31

Bunkers on delivery as onboard and bunker on redelivery about same quantity as on delivery.
Bunker prices USD      per metric tons for IFO and USD      per metric ton for MDO at both ends.

Charterers are allowed to bunker the vessel for charterers' account before delivery provided it does not interfere with cargo operations.

Charterers/Owners allowed to replenish additional bunkers if necessary at yard/last discharge port before delivery/redelivery at Charterers/Owners account provided the same not interfere with proper operation of the vessel.

If RME 25 is not available in South Africa/South America, Charterers have option to stem RMF 25 available.

### Clause 32 – Grace Period

When hire is due and not received, the Owners before exercising the option of withdrawing the vessel from the Charter Party will give Charterers seventy-two (72) hours notice, Saturdays, Sundays and holidays excluded and will not withdraw the vessel if the hire is paid within these seventy-two (72) hours.

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 32 - continued

At any time after the expiry of the grace period provide as above and while the hire is still outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold the performance of any and all of their obligations under the Charter Party and shall have no responsibility whatsoever for any consequences thereof, in respect of which the Charters shall indemnify the Owners and hire shall continue to accrue and any extra expenses resulting shall be for the Charterers' account.

### Clause 33

A joint on-hire survey including bunkers and condition is to be held in Owners' time at delivery port and/or first loading port but vessel to be remain on hire in case have cargo operation in the same time. A joint off-hire survey including bunkers and condition is to be held in Charterers' time at redelivery port. The cost of these surveys are to be equally shared between Owners and Charterers. The appointment of the surveyors is to be agreed jointly between Owners and Charterers.

### Clause 34

The stevedores, although appointed and paid by the Charterers, Shippers or Receivers or their Agents, are to be regarded as servants of the Owners and to remain under the direction and control of the Master who will be responsible for proper stowage and seaworthiness of his vessel. The Charterers to be responsible for damage caused by the negligence of stevedores in loading and discharging the vessel only which such damage is duly substantiated by the Master prompt notice of claim served in writing upon the party responsible within 24 hours of occurrence of damage or latest on completion of loading and/or discharging of the vessel at the port concerned.

However, in the case of hidden damage, the Master is to advise Charterers or their Agents as soon as possible after discovery but no later than time of redelivery. Stevedores damage report to be issued prior to sailing and copy of all correspondence exchanged in this connection must be forwarded promptly to the Charterers. The Master shall co-operate with the Charterers or their Agents try best to obtain a written acknowledgment by the responsible parties causing damage unless the damage should have been made good in the meantime. The Charterers have the option of redelivering the vessel without repairing such stevedore damage that does not affect seaworthiness of the vessel or normal working and trading of the vessel.

The Owners agree that damage not affecting seaworthiness or efficiency and safe working of the ship may remain for occasional repair when the ship is to be docked for Owners' account so that the Charterers to pay the actual cost of repair for stevedore damage but not time used.

HOWE ROBINSON                    2

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 35

Charterers to be responsible for any fines whatsoever imposed in the event of smuggling by Charterers employees, but Owners are to be responsible for any such acts of their own Officers and/or crew. Charterers are to remain responsible for detention of the vessel due to smuggling committed by Charterers employees only. Owners are always to be responsible for Master's and/or crew's negligence in performing their duties.

### Clause 36

Should the vessel be put into any other port other than those instructed by the Charterers by reason of accident or breakdown or for the purpose of landing any injured or sick Officer, including the Master or members of the crew, the port charges, pilotages and other expenses including losses of time shall be borne by the Owners. Also should the vessel be put back whilst on voyage by any of the above mentioned reasons, the hire shall be suspended from the time of her putting back until she is against in the same or equivalent, position and the voyage resumed therefrom.

### Clause 37

Both parties to have the option of cancelling this Charter Party with reasonable notice, if war breaks out between any two or more of the following countries U.S.A., Great Britain, Japan, U.S.S.R., The People's Republic of China, France, Republic of Korea, Greece, North Korea and Turkey.

### Clause 38

The Charterers to have the benefits of any return insurance premium receivable by Owners from their Underwriters, as and when received by Underwriters, by reason of vessel being in port or a minimum period of 30 days.

### Clause 39

If the vessel will be off-hire for longer than 30 days continuously, the Charterers have the option of cancelling this Charter, provided no cargo on board.
The Charterers have the option of adding the times lost by vessel being put off-hire to charter period.

### Clause 40

Owners engage themselves to maintain the vessel classed during the currency of this Charter.

HOWE ROBINSON                    3

M.V. "JIN TONG"
## CHARTER PARTY DATED 7th MAY, 2008
### ADDITIONAL CLAUSES

### Clause 41

Owners guarantee that vessel is not black listed by any Arab league countries. Vessel is not black listed by US/Canadian longshoremen's union.

If immigration department or USCG may request security guards/gangway watchman during ship stay in USA port, and such cost to be considered as port charges and to be for Charterers' account.

### Clause 42

At loading and discharging port(s) any time lost by vessel for reason of all crew not being on board when the vessel is ready to sail to be for Owners' account, as well as directly related expenses deriving therefrom.

### Clause 43

Charterers to pay USD 1,250 per month or pro-rata for cable/entertainment/victualling charges.

### Clause 44

Vessel to be delivered with valid deratisation or deratisation exemption certificate on board, and if this does not cover the whole period of time charter, Owners undertake to carry out all necessary steps to renew such certificates and cost for same and detention to be for Owners' account, except as provided for in Clause 2.

### Clause 45     Vessel's Description

**M.V. "JIN TONG"**
'Dolphin type'
Singe deck bulk carrier Hong Kong 08
57000 dwt bulk carrier on 12,82 metres summer salt water
5 Holds / Hatches 71,500 cbm grain, including hatch coamings
Class ABS
4 x 35 mts cranes + 4 grabs x 12.50 cbm
189,99 / 32,26 metres LOA / beam
GT / NT about 32300 / about 18700
about 14,2 knots under good weather condition on about 31mts IFO maximum 180 cst + about 1.9 mt IFO
Vessel will burn about 1.9 mt MDO daily for the about 1st 30 days


(All details about/without guarantee and subject to yard final confirmation )



HOWE ROBINSON                    4

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 46

With reference to Clause 4 of this Charter Party, hire is payable to Owners' bank account for hire payments as follows:

Bank Account:
PLEASE ARRANGE THE REMITTANCE
TO THE FOLLOWING BANK A/C :

IN FAVOUR OF :
FOR CREDIT OF :
WITH MESSAGE:

Please arrange the remittance by SWIFT MT103/tested telex to the following bank account:

### Clause 47

Should vessel be arrested during the currency of this Charter Party at the suite of any person having or purporting to have a claim or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as the result of such arrest and the Owners shall reimburse the Charterers any expenditure which they incur under this Charter Party in respect of any period during which, by virtue of the operation of this Clause, no hire is payable.

### Clause 48

Vessel's hold condition on vessel's delivery to be clean swept and dried up so as to receive Charterers intended cargoes in all respects, free of salt, rust loose scales and previous cargo residue to the satisfaction of on-hire surveyors. In case vessel's holds fail to pass, then vessel should be placed off-hire from time of such failure until vessel pass the same inspection satisfactory and any directly related expenses/time incurred thereby to be for Owners' account.

In case vessel commenced loading on the passed holds then vessel to be off-hire on pro-rata basis.

Charterers have the liberty to redeliver the vessel with unclean holds paying the Owners a lumpsum of USD 5,000 in lieu of cleaning including removal/disposal of dunnage which to be for Owners' time and expense. However always understood that Charterers are to remove dunnage from holds and place same on deck at their time/risk/expense.

HOWE ROBINSON                                5

M.V. "JIN TONG"
**CHARTER PARTY DATED 7th MAY, 2008**
**ADDITIONAL CLAUSES**

### Clause 48 continued

**Intermediate Hold Cleaning:**

Upon completion of discharge of each cargo (save the last cargo prior to redelivery), vessel's crew shall render customary assistance in cleaning a cargo compartments in preparation for the next cargo, if required by Charterers and if not prevented by any regulations or agreement whatsoever.

Such cleaning work shall be performed while vessel is en route to next loading port, provided that this can be safely done and that the duration of voyage is sufficient Charterers shall pay to Owners:

- Intermediate hold cleaning: USD 400.00 per hold if used
- Intermediate hold cleaning for each
  Bulk cement, petcoke, sulphur: 6,000.00 lumpsum
  Each time such cleaning is performed;

Owners will endeavour to effect such cleaning as best possible, but without any guarantee that cargo holds will be sufficiently cleaned and accepted on arrival at loading port and Owners shall not be responsible for any consequences arising from the facts that vessel's crew has been employed in cleaning.

Cleaning agents, if required, are to be for Charterers account. It is understood that the crew will do their utmost to clean holds at quickly and efficiently.

### Clause 49

Charterers and/or their Agent have option to sign Bills of Lading on behalf of Master in strict accordance with Mate receipts without prejudice to this Charter Party.

### Clause 50

First hire and value of bunkers on delivery are to be paid after 2 banking days after vessel's delivery. Charterers are entitled to deduct from last sufficient hire payments estimated Owners' disbursement but maximum USD 400 per port, as well as value of estimated quantity of bunkers on redelivery.

### Clause 51

The vessel is suitable for grab loading/discharge and no cargo to be loaded in places inaccessible to grab or in deep tanks. Charterers are to have the privilege of using bulldozers in vessel's holds. However, unit weight of bulldozers will not exceed vessel's tank top strengths permitted and her operation always under Master satisfaction.

HOWE ROBINSON                          6

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 52

Normal quarantine time and expenses for vessel entering port(s) to be for Charterers account, but any time of detention and expenses for quarantine due to pestilence, illness etc., of Master/officer/crew to be for Owners' account.

### Clause 53

All parties concerned including brokers are not allowed to disclose any details of this negotiation/fixture to any outside parties.

Charterers are to issue guarantee letter by as per Owners confirmation / wording. However Charterers have an option to issue the guarantee letter by subject Charterers provided further details of the company and upto Owners satisfactory but not reject unreasonably.

### Clause 54

Vessel's officers and crew are at least contracted to I.T.F. standards. Should the vessel be seized or detained by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention is ceased immediately from the time of her seizure or detention and all time lost by this reason shall be treated as off-hire until the time she resumes full service, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their Agents or by reason of cargo carried. Any direct related expenses incurred by and/or during the above seizure or detention are to be for Owners' account, unless such seizure or detention is occasioned by any person, act or omission or default of the Charterers or their Agents, or by reason of cargo carried.

If the vessel is off-hire for 30 (thirty) consecutive days by reason of above seizure or detention, unless such seizure or detention is occasioned by any person act or omission or default of the Charterers or their Agents or by reason of cargo carried, Charterers have the option of cancelling the balance of this Charter Party, always provided no cargo on board. In any case should vessel be detained, delayed or otherwise as described above, due to any fault of the Owners or their servants as outlined above, Owners will immediately take necessary action to overcome such delays.

### Clause 55

The vessel has a grain certificate on board enabling her to load up to and including a full cargo of grain in bulk without fittings but always accordance to Solas/IMO Recommendations/Regulations.

### Clause 56

The Owners warrant the vessel to be always safe in ballast.

HOWE ROBINSON                                7

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 57

For the purpose of computing hire payments, the time for delivery and redeliver shall be adjusted to GMT.

### Clause 58

Owners guarantee Certificate of Financial Responsibility is fully valid under this Charter period. Any time lost or expense incurred through failure to do so to be for Owners' account. The Master and the Owners shall be fully and financially responsible for all pollution caused by spillage or leakage unless pollution is caused by any act of negligence of Charterers or their servants.

The Owners warrant that the vessel is eligible for bunkers in the United States of America, its territories possessions.

### Clause 59

Master to have vessel ready for immediate cargo operations on arrival at each port in accordance with Charterers local Agent's instructions as far as this is possible.

Additionally, the Owners will provide at their own risk and expense for the officers and/or crew to carry out the following duties:

- all opening and closing of hatches for loading and/or discharging, weather and local regulations permitting
- maintaining power while loading and/or discharging
- shifting ship during loading and/or discharging and boards
- docking and undocking
- bunkering
- officers and crew to shape up hatches as much as possible, weather permitting prior to arrival at loading and/or discharging operation

All above are always subject to local shore labour regulations.

The Master shall be responsible for all gear, equipment, and/or stores supplied by or for Charterers' account and the Master shall keep a record of all such gear, equipment and/or stores so supplied. Master is to maintain same as Owners' property but without guarantee.

Such gear, equipment and/or stores to be redelivered to Charterers prior to the redelivery of the vessel to the Owners, fair wear and tear excepted.

M.V. "JIN TONG"
**CHARTER PARTY DATED 7ᵗʰ MAY, 2008**
**ADDITIONAL CLAUSES**

### Clause 60 – Cargo Exclusions

Charterers have option max 6 (six) per year out of bulk sulphur, bulk cement (two cargoes per year), bulk cement clinker, bulk petcoke, which same not to be on consecutive voyages but agree maximum one consecutive voyages per annum and not to be the last cargo prior redelivery.

**Cargo Exclusions:**
All dangerous, inflammable, injurious, hazardous and corrosive cargoes, explosives of any kind including blasting caps and detonators, black powder, arms, ammunition and war material of any kind, nuclear fuel or substances or radioactive material of any kind and/or their wastes, acid, petroleum or its products, naptha, turpentine, motor spirits, carbon black. Asphalt, pitch, tar, sulphur, ammonium sulphate, ammonium nitrate, harmful and corrosive fertiliser. Calcium carbide, barites,    calcium hypochlorite, borax, charcoal, creosoted goods, logs of any kind copra and/or its products, salts, wet hides, petroleum coke, Indian coals, loaded bombs, dynamite, TNT, no IMO dangerous cargoes, livestock, hides, asbestos, caustic soda, direct reduced iron/ore briquettes lumps/pellets, sludge ore, ferro silicon, pyrites, sponge iron/pig iron/pre reduced iron, H.B.I., ferro manganese, silicon manganese, quick lime, sunflower seed expellers, scrap including motor blocks and turnings, metal boring and cuttings, fishmeal, bones and meatbone meal, resin, saltcake, shavings, tobacco, pitch in bulk or drums, charcoal in gunny bags, quebracho extracts, bulk wheat flour, bulk rice. Bulk milled rice, railway wagons, cement, deck cargo, overweight cargo (which exceeds vessel's tank top strength limitation) and the cargo of which the nature could affect the safety of vessel, crew and cargo loaded on board.

Charterers can load concentrates except lead concentrates however all concentrates to be loaded/stowed/trimmed and discharged in accordance to latest IMO rules and regulations.

Charterers can load ore pellets, but first layer to be loaded at height and to be evenly stowed/trimmed to Masters' satisfaction before loading balance cargo.

**Bulk Sulphur – Owners Protective Clause**

Notwithstanding the cargo exclusions as above, Charterers have liberty to carry cargo of sulphur, (whether it be full or part cargo), during the entire currency of this charter, on following conditions:

    a) Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permitting:

    b) Before loading all holds assigned for sulphur to be lime-washed by Charterers at their time/expense/risk to satisfaction of Master and independent surveyors appointed by Charterers at their expense:

    c) Cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO and/or any other latest regulations/rules applicable to such cargo:

    d) After discharge Charterers to supply sufficient fresh water at their expense for washing down of all holds: and lime residues in cargo hold(s) to be removed at Charterers' time and expenses.

**HOWE ROBINSON**                                    9

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 60  - continued

e)  Such cargo not to be the last cargo prior to redelivery
f)  Any extra expenses resulting therefrom/incurred thereby and any detention through any of above causes to be for Charterers' account

The liberty granted to Charterers herein is subject to Charterers' guarantee that the above-mentioned commodities will be not carried in consecutive shipments/voyage. Owners have right to withdraw the liberty granted to Charterers herein in case of any breach of above by Charterers.

**Bulk Petcoke – Owners Protective Clause**

Notwithstanding the cargo exclusions as above, Charterers have liberty to carry cargo of petroleum coke, (whether it be full or part cargo), during the entire currency of this Charter on following conditions:

a)  deleted
b)  the petroleum coke mentioned herein is only limited to petroleum coke of non-oily/non-hazardous/non-dangerous calcined type, green delay petcoke.
c)  if Charterers exercise such option, Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permitting,
d)  such cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO and/or any other latest regulations/rules applicable to such cargo
e)  should any additional / special washdown of holds before loading be recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time,
f)  after discharge Charterers to arrange at their expense/time any additional/special washdown of holds carrying such cargo by chemical as Master considers it necessary,
g)  such cargo not to be the last cargo prior to redelivery,
h)  any extra expenses resulting therefrom/incurred thereby and any detention through any of above causes to be for Charterers' account.

**Cement in Bulk – Protective Clause**

Notwithstanding the cargo exclusions as above, Charterers have liberty to carry cargoes of bulk cement, (whether it be full or part cargo), during the entire currency of this Charter on following conditions:

a)  Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permitting
b)  Should any additional/special washdown of holds before loading be required/recommended by independent surveyor appointed by Charterers at their expense, such washdown to be arranged by Charterers at their expense.
c)  Charterers are not allowed to drill holes and/or make any openings on any hatch covers for purposes of loading/stowing/trimming/discharging.

HOWE ROBINSON                              10

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

## Clause 60 - continued

d) After loading Charterers undertake to arrange at their expenses any special/extra trimming and/or levelling of cargo to Master's satisfaction and also Charterers to give reasonable time to allow for the cargo to settle and any air to escape before vessel's departure from loading berth/port.

e) Such cargo not to be the last cargo prior to redelivery.

f) Charterers will supply enough Ramneck marine tape to seal all cargo hatches after loaded cement cargo and under Charterers account.

g) After cement cargo, Charterers will supply cleaning materials, fresh water and submersible pump for cargo holds cleaning under Charterers account. Ship's pipes line will not be allowed for pumping out bilges water with residue of cement cargo.

h) Any extra expenses resulting therefrom/incurred thereby and any detention through any of above causes to be for Charterers' account.

i) The liberty granted to Charterers herein is subject to Charterers' guarantee that the above-mentioned commodities will be not carried in consecutive shipments/voyages. Owners have right to withdraw the liberty granted to Charterers herein in case of any breach of above by Charterers.

Vessel has cement hole on board.

Maximum 1 Chilean rock salt per annum, which against Owners Protective Clause:

**Chilean Rock Salt Protective Clause**

Charterers are permitted to carry cargo of rock salt, whether it be full or part cargo, charterers guarantee maximum moisture content not exceeding 0.075 pct. After discharge Charterers to supply sufficient fresh water at their expense for washing down of all holds. Any extra expenses resulting therefrom/incurred thereby (such as hold cleaning to Master's satisfaction/hold survey etc) and any detention through any of above causes to be for Charterers' account.

The liberty granted to Charterers herein is subject to Charterers' guarantee that the above-mentioned commodities will be not carried in consecutive shipments/voyages. Owners have right to withdraw the liberty granted to Charterers herein in case of any breach of above by Charterers.

## Clause 61

The service of Ocean Routes or equivalent, which company to be prior Owners' approval which not to be unreasonably withheld may be engaged at Charterers' expense to recommend optimum route and advise Master about weather en-route. Master shall be free to follow Ocean routes or equivalent, which company to be prior Owners' approval, recommendation and directions to route course and/or weather in accordance with the safety of the vessel and crew which are left entirely to his discretion.

HOWE ROBINSON                        11

M.V. "JIN TONG"
**CHARTER PARTY DATED 7th MAY, 2008**
**ADDITIONAL CLAUSES**

### Clause 61 – continued

Charterers shall not be responsible in any way for Ocean Route information, direction and recommendations which are provided as assistance only and entirely without prejudice. The Master shall prepare a deck log abstract for each sea passage showing daily noon position and all other relevant information.

The Charterers may supply an Independent Weather Bureau's advise to the Master during voyages specified by the Charterers the Master shall comply with the reporting procedure of the routing service selected by the Charterers evidence of weather conditions shall be taken from the vessel's deck logs and the independent weather bureau's reports in the event of a consistent discrepancy between the deck logs and the independent weather bureau's reports, the independent weather bureaus reports shall be taken as ruling, For the purpose of this Charter Party good weather conditions shall be defined as weather conditions not exceeding in winds Beaufort Force 4 and Douglas Sea State 3, about on speed means 0.5 knot allowance. Independent weather bureaus are to be Weather news Ocean routes AWT only.

### Clause 62

Owners have option to sell the vessel during the charter period under Charterers' prior consent which not to be unreasonably withheld.

### Clause 63

Watchmen, if any, are to be for the account of the party ordering same, if compulsory always to be for Charterers' account.

### Clause 64

All loading and discharging operations to be free of expense to Owners.

### Clause 65

Owners P. and I. Club: Reverting

### Clause 66

Liabilities for cargo claims shall be borne by Owners/Time Charterers in accordance with the latest Interclub New York Produce Exchange Agreement. The party having paid claims shall submit to the other party supporting documents as soon as possible. Neither party shall between themselves refer to the one year time limit as a defence.

HOWE ROBINSON                    12

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 67- Trading Exclusions

Cuba, Lebanon, Syria, Albania, Turkish occupied Cyprus, Madagascar, Libya (including Gulf of Sidra/Sirte), Nicaragua, Great Lakes, Israel or Israeli controlled countries/areas, Liberia, Zaire, Iraq, North Korea, Angola (including Cabinda), Former states of Yugoslavia, coast ports of Sea of Azov allowed only after April 1st up to and including 15th November but always subject to the Ice Clause of this Charter Party.

Jordan, but Aqaba allowed and the Charterers guarantee vessel will not be blacklisted by any other countries after calling Aqaba, also any and all consequences for vessel calling Aquaba to be for Charterers sole account and responsibility.

Pacific Russian/C.I.S./Siberian ports including Sakhalin Island, Namibia, Ethiopia, Somalia, Peoples Republic of Yemen (North and South) Sri Lanka, Cambodia, Georgia (including Abkhazia), Haiti, Cyprus, Finland, Belize, Honduras.

The vessel may call at Kuwait but any and all consequences for vessel calling Kuwait to be at Charterers sole account and responsibility.

Owners will consider direct trading between Taiwan ports and China Mainland ports when it becomes lawful as between these two places and will not bring any risk and extra expense to the crew, vessel and Owners. Owners' approval is not to be unreasonably withheld.

War and war like zones and other countries having hostilities with vessel's flag, places which may be excluded by authority of vessel's flag. Any Ice-bound port(s) where vessel will not be able to reach or leave after and/or before loading and/or discharging, vessel not to force ice and not to follow ice breaker under any circumstances.

Any basic war risk premium to be for Owners account, any additional war risk insurance premium and/or any increase in war risk insurance premium including blocking and trapping and crew war bonus for trading to areas where such additional and/or increased premium/crew war bonus are payable as designated by owners war risk underwriters/owners' tariff on crew war bonus to be for charterers account.

Charterers shall not be permitted to employ the vessel consecutively for more than thirty (30) days in any trade(s) where steaming at full Charter Party speed between ports is less than seven (7) days.

### Clause 68

New Jason Clause, Both to Blame Clause, BIMCO Voyage 1993, P and I Bunkers Clause as per Clause 29, General Clause Paramount are to be incorporated in all Bills of Lading. ISPS Clause is to apply and ISM Clause to apply.

HOWE ROBINSON                         13

## M.V. "JIN TONG"
## CHARTER PARTY DATED 7th MAY, 2008
## ADDITIONAL CLAUSES

### Clause 69

Any dues/taxes on cargo and/or freight or earned under this Charter Party or its sub-hires and/or sub-freight to be for the Charterers' account.

In case of loss of time due to boycott, picket at any port or place by the shore and/or port labour and/or the tugboat(s) and/or pilots and/or governmental authority directly attributable to Ownership, and/or the terms and conditions on which members of the officers/crew were employed. Vessel then to be off-hired for any time lost thereby and the cost bunkers consumed during the period to be for Owners' account.

### Clause 70

Deleted

### Clause 71

Owners to provide by fax invoice on their headed paper to the Charterers covering each Charterers' remittance but such fax invoices not to be considered a condition required for hire or other payments and on no occasion are such payments to be delayed by Charterers on this account when they are due.

### Clause 72

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port of place in the U.S.A. shall have been endorsed with unique Bills of Lading identifier as required by the U.S. Customs Regulation (19 GRE Part 4 Section 47. A.) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of the Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers breach of the provisions of this Clause shall be for the Charterers account.

### Clause 73

Charterers Bills of Lading (on Congen Bill form or equivalent) to be used and Master to release to Charterers or their agents his authority to sign Bills of Lading on his behalf provided in strict accordance with Mate's Receipts and Charterers holding Owners harmless against all consequences arising out of their signing Bills of Lading.

### Clause 74

All Bills of Lading are to contain the Hague or Hague Visby Rules.

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 75

Any cargo separations other than by vessel's natural separations are to be for Charterers' time, risk and expense.

### Clause 76 – BIMCO Double Banking Clause

a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

### Clause 77

Owners to allow Charterers to discharging cargos without presentation of original Bill(s) of Lading by providing with Letter of Indemnity in accordance with Owners' P and I Club form and wording before discharging. Letter of Indemnity is to be stamped/signed by Charterers only.

### Clause 78

Both-to-Blame Collision Clause, New Jason Clause, BIMCO Conwartime 2004 Clause, P. and I. Bunkering Clause, General Clause Paramount, U.K. Clause Paramount, U.S.A. Clause Paramount, Canadian Clause Paramount, ISPS Clause and ISM Clause as applicable are to be considered part of this Charter Party.

HOWE ROBINSON                              15

M.V. "JIN TONG"
**CHARTER PARTY DATED 7th MAY, 2008**
<u>ADDITIONAL CLAUSES</u>

<u>**Clause 79**</u>

All negotiations and eventual fixture are to be kept private and confidential.

<u>**Clause 80**</u>

Charterers' Agents at both loading and discharging and discharging port not to attend major Owners' matters.

<u>**Clause 81**</u>

Owners guarantee vessel is free from Asian Gypsy Moth.

<u>**Clause 82**</u>

Overage insurance on cargo due to vessel's age is to be for Charterers' account.

<u>**Clause 83**</u>

Owners guarantee that vessel's hatchcovers are to be watertight all throughout this Charter period and if any hatchcovers found defective, same to be rectified at Owners time and expense to independent survey satisfaction, Charterers also have the right to carry hose test on all hatches at anytime during this Charter.

<u>**Clause 84**</u>

Owners guarantee vessel is single deck self-trimming bulk carrier and bridge and engine room after and no obstructer in cargo compartment. Owners guarantee vessel is fully grain fitted/self trimming but always accordance to Solas/IMO Recommendation/Regulations.

<u>**Clause 85**</u>

Owners confirm vessel's gears are in good working condition. Actual time lost on account of breakdown of the vessel's gear or other gear essential to the loading / discharging to be deducted from hire in relation to number of workable holds. If due to vessel's gear breakdown, Charterers to engage shore crane with actual cost to be for Owners' account and vessel to remain on hire, but always subject to Owners/Master's approval which not to be unreasonably withheld – and if any stevedores/terminals standby times are charged or incurred thereby, such actual expenses shall be for Owners' account.

<u>**Clause 86**</u>

Vessel is fully fitted with ITF/WWF/AHL on delivery and under this Charter.

HOWE ROBINSON                              16

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

## Clause 87

Owners guarantee vessel not to be rejected at any port of call permitted under this Charter Party during charter period by reason of trading with Cuba before and any time/expense incurred thereby to be for Owners account.

## Clause 88 – BIMCO Standard ISM Clause

From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirements of this ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this charter, loss, damage, expense, or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code, shall be for Owners' account.

## Clause 89

Charterers have the option to use grabs on board free of charge.

## Clause 90

Deleted

## Clause 91 – GA + Arbitration in London. English law to apply

For disputes where the total amount claimed by either party does not exceed the amount USD 50,000 the arbitration shall be conducted in accordance with the small claims procedure 2002 of the London Maritime Arbitrators Association.

All cargo claims to be settled in accordance with the NYPE Interclub Agreement incorporation latest amendments.

## Clause 92

The Owners shall have the option to place the vessel in drydock during the currency of this charter at a convenient time and place to be mutually agreed between the Owners and the Charterers for bottom cleaning and painting and/or repair as required by class or directed by circumstances.

Owners are to notify Charterers of the intention of such drydocking and/or periodical survey 3 months in advance, except for emergency case, and Charterers will bring the vessel to Singapore/Japan range for drydocking.

HOWE ROBINSON                          17

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 93

Owners will give Charterers not less than 30/20 days approximate notice of vessel's expected date of delivery and 10/7/5/3/2/1 days notice of delivery. Owners to narrow 15 days spread Lay/Can together with 30 days delivery notice.

### Clause 94

Throughout the period of the Charter, vessel to be in possession of all necessary valid equipment and certificates to comply with safety and health regulations, national and international regulations, and all current requirements at all ports of call, Panama and Suez canal included.

### Clause 95

Owners guarantee that the vessel will comply with regulations and requirements at all ports of call and have certificates on board applicable to those ports/countries where the vessel will trade under this Charter.

### Clause 96 – Charterers Bill(s) of Lading forms to be used, if required

No Liner/Way/Through Bills of Lading to be issued under this charter.

Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, Waybill or other document evidencing a contract of carriage (whether or not sighed on behalf of the Owners or on behalf of the Charterers or on behalf of the Sub-Charterers) incorporating, where not compulsorily applicable, The Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague-Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

Charterers and/or their agents have the right to issue and sign seaway bills (Genwaybill form) in lieu of Bills of Lading for cargo discharge in Japanese ports only. At the discharging ports, cargo to be released without presentation of non negotiable seaway bill and L.O.I., in which case Charterers shall indemnify and keep Owners and the vessel harmless from all consequences arising from doing so.

### Clause 97

It is understood that if necessary, vessel will comply with any safety/health regulations and/or requirements in effect at ports of loading and/or discharging, a particular reference is the United States Department of Labour Safety and Health Regulations set forth in part III of the federal register. Although other provisions of this Charter make it the responsibility of the Owners it is agreed that should the vessel not meet safety/health rules and regulations, Owners will take immediate corrective measures and any stevedore standby time including off hire, will be for the Owners' account.

HOWE ROBINSON                                    18

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 98

Vessel's cargo gear and all other equipments are ABS classed also vessel's gear shall comply with the regulations of the country in which vessel will be employed and Owners to ensure that vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such if required.

### Clause 99 - Oil Pollution Clause

a) If the Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters, of any country or state in performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Owners' sole expense, unless this pollution rose by reason of Charterers' negligence.

b) The Charterers shall be under no responsibility for all consequences (including loss of time) of oil or other pollution damage and failure or inability of the Owners to do so as provided for above and any loss of time incurred thereby to be off-hire, unless this pollution rose by reason of Charterers negligence.

### Clause 100

Deleted

### Clause 101

Deleted

### Clause 102

No Objection Certificate for Indian trading to be given to charterers, if required.

### Clause 103 – Off-hire Add-Up

The Charterers may in their option, add to the time charter period, partly or wholly, any off-hire period(s), which to be declared prior minimum charter period two months ago.

### Clause 104

Throughout the period of this Charter vessel will have on board current valid and up-to-date Panama and Suez Canal Measurement certificates and will so comply with all applicable requirements, regulations and recommendations of the Canal Authority so as to avoid any delay in transit of the Panama or Suez Canal.

HOWE ROBINSON                    19

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

### Clause 104 - continued

Any delay caused by non-compliance with the aforesaid or lack of proper documentation and/or certificates and/or equipment and fittings required to transit the Panama Canal will be considered off-hire and any expenses resulting from such delay including bunkers consumed during the period will be for Owners' account.

### Clause 105 – Bottom Fouling Clause

The case of the vessel's bottom fouling due to Charterers ordering the vessel to stay in port for a period exceeding 30 days, Owners will carry out bottom cleaning at said port or next available port where there are such facilities, expenses and time to be equally shared. Charterers will not claim on vessel's performance until such cleaning has been carried out.

### Clause 106 – Break IWL Clause

Charterers shall have the privilege of breaking Institute Warranty Limits by giving due advance notice to Owners and seek Owners' prior consent and Charterers paying any extra insurance premium thereby incurred, but in no case shall exceed the London scale. This extra insurance is to be covered by Owners with their hull underwriters and to be reimbursed by the Charterers against presentation of such invoice.

### Clause 107 – Supercargoes/Port Captains

Whenever required, the Master must bring the vessel into even trim to ensure correct bunker soundings. The Charterers and/or their supercargo(es) and/or surveyors to have free and unlimited access to the vessel's tank plans, calibration scales and/or other plans as requested. Charterers can get directly from Owners copied of deck and engine log book.

### Clause 108

Deleted

### Clause 109 – NAABSA Clause

Charterers have the option to trade vessel in Argentina/Brazil grain port only but maximum for 2 times per year, where vessel of similar size customarily lie safely aground. Owners have option to arrange inspection of vessel's bottom and underwater parts by diver and class surveyor before sailing from the NAABSA port. If any damage is found to vessel's bottom or underwater part, any extra time incurred and expenses for such inspection shall be for Charterers' account. If no damage is found to vessel's bottom or underwater part, any extra time incurred and expenses for such inspection shall shared equally between Owners and Charterers.

HOWE ROBINSON                           20

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

## Clause 110 – Standard BIMCO Fuel Sulphur content clause

Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to meet the maximum sulphur content requirements of any emission control zone when the vessel is trading within that zone.

The Charterers shall indemnity, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI or any amendments thereof and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## Clause 111  - BIMCO AMS Clause For Time Charter Parties

(a)    If the Vessel loads or carries cargo destined for the U.S. or passing through US ports in transit, the Charterers shall comply with the current U.S. Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)    Have in place a SCAC (Standard Carrier Alpha Code);
ii)    Have in place an ICB (International Carrier Bond);
iii)    Provide the Owners with a timely confirmation of i) and ii) above; and
iv)    Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b)    The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs arising from the Charterers' failure to comply with any of the provisions of subclause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c)    If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)    The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

HOWE ROBINSON                    21

**M.V. "JIN TONG"**
**CHARTER PARTY DATED 7th MAY, 2008**
**ADDITIONAL CLAUSES**

**Clause 111 – continued**

**ISPS Clause For Time Charter Parties**

(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/ Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision.

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

HOWE ROBINSON                    22

M.V. "JIN TONG"
**CHARTER PARTY DATED 7th MAY, 2008**
**ADDITIONAL CLAUSES**

**Clause 112**

Charterers have the option to discharge any cargo loaded at any port other than final destination. Charterers indemnify owners from any responsibility, risk, expenses which may arise from Owners discharging cargo as per Charterers instructions against Charterers signing Owners form/Letter of indemnity.

**Clause 113**

Owners guarantee that valid ITF or equivalent agreement for the vessel covering any port or place is available on board for the whole period of this charter.

**Clause 114**

1. If steel coils to be loaded, Owners will allow Charterers to load same within vessel tank top strength permitted.
2. Owners warrant that vessels holds are clear of any fittings/superstructures, such as car deck/curtain plates.

**Clause 115 – Grabs**

Owners guarantee grab is suitable for loading and discharging iron ore as per vessels description clause, and Charterers is free to use grab on board.

M.V. "JIN TONG"
**CHARTER PARTY DATED 7th MAY, 2008**
**ADDITIONAL CLAUSES**

**War Risks Clause for Time Charters, 2004 (Code Name: CONWARTIME 2004)**

(a)    For the purpose of this Clause, the words:

    (i)    "Owners" shall include the Shipowners, bareboat charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    (ii)   "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)    The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d)    (i) The Owners may affect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)   If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)   The Vessel shall have liberty:-

(i)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)   to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)  to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)   to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)    to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

HOWE ROBINSON                    25

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

(g)     If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)     If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.


### General Average and the New Jason Clause

General Average shall be adjusted according to York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery".

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.


HOWE ROBINSON                    26

M.V. "JIN TONG"
**CHARTER PARTY DATED 7th MAY, 2008**
<u>**ADDITIONAL CLAUSES**</u>

### <u>Canadian clause Paramount</u>

This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods Act, 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent such terms shall be void to that extent but no further.

### <u>U.S.A. Clause Paramount</u>

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said act to any extent, such terms shall be void to that extent, but no further.

### <u>BIMCO ISPS Clause for Time Charter Parties</u>

(b) (i)  From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i)  The Charterers shall provide the CSO and the Ship Security Officer (SSO)/ Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision.

HOWE ROBINSON                    27

M.V. "JIN TONG"
CHARTER PARTY DATED 7th MAY, 2008
ADDITIONAL CLAUSES

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

# Exhibit 3

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**

GALSWORTHY LIMITED
of ~~Hong Kong~~ *the Republic of Liberia*

and

GLORY WEALTH SHIPPING PTE LTD
of Singapore

I, the undersigned, do hereby certify
that I have examined the foregoing
documents with its original/certified copy
and that the same is a true and complete
copy thereof,
Dated 16.11.2009

*Leung*

LEUNG SHARON YIN TING
Solicitor, Hong Kong SAR
DLA PIPER HONG KONG

Claimants
(Owners)

Respondents
(Charterers)

## "JIN TONG" C/P dd 7.5.08

### FINAL AWARD

**WHEREAS:**

(A)    By a time charter on the NYPE form, with amendments, dated 7 May 2008, the claimants ("the owners") chartered to the respondents ("the charterers") the ship "JIN TONG" (of which the claimants were disponent owners) for a period on terms and conditions more particularly set out therein.

(B)    Clauses 17 and 91 of the said charter provided for English law to apply and for any disputes arising under the charter to be referred to arbitration in London in a manner more particularly set out therein.

(C)   A dispute having arisen, the owners in due course appointed me, the undersigned Bruce Harris of Flat 101, 7 High Holborn, London WC1V 6DR and the charterers appointed me, the undersigned Patrick O'Donovan of Churcham House, 1 Bridgeman Road, Teddington, TW11 9AJ as arbitrators respectively, and in due course the said arbitrators appointed me, the undersigned Alan Oakley of Hoy's Farm, Upwick Green, Albury, Ware, SG11 2LD as third arbitrator. We all accepted appointment on the basis of the LMAA Terms (2006) which accordingly applied to this reference. The seat of the arbitration is London, England.

(D)   The dispute referred to us concerned the owners' claim for hire in the sum of $1,114,406.82 and damages of $45,460,735.31 arising from the failure by the charterers to perform the charter, liability for which the charterers denied; and the charterers' counterclaim for repayment of hire already paid and for damages of $10,250,625 in respect of what they said was the owners' repudiation of the charter, liability for which the owners denied.

(E)   The parties' lawyers provided us with written submissions and copies of the documents upon which they relied. Neither party requested an oral hearing.

**NOW WE,** the said Bruce Harris, Patrick O'Donovan and Alan Oakley, having taken upon ourselves the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before us, and having given due weight thereto, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FINAL AWARD** as follows:

1.    **WE FIND AND HOLD** that the owners' claims succeed in the sum of $1,114,406.82 in respect of hire and $39,393,745.03 only in respect of damages, and that the charterers' counterclaims fail and are hereby dismissed.

2.    **WE THEREFORE AWARD AND ADJUDGE** that the charterers shall forthwith pay to the owners the sum of $40,508,151.85 (Forty million, five hundred and eight thousand one hundred and fifty-one United States Dollars and eighty-five cents) together with interest thereon at the rate of 4.50% (four and one-half per cent) per annum compounded at three-monthly rests from 1 January 2009 until the date of payment hereunder.

3.    **WE FURTHER AWARD AND DIRECT** that the charterers shall bear and pay their own and (on the standard basis) the owners' costs of this reference (and we reserve to ourselves the right to assess and make a further Award in respect of the amount of such costs) together with the costs of this Award which we hereby fix in the sum of £9,680 (Nine thousand six hundred and eighty Pounds Sterling) **PROVIDED** that if, in the first instance, the owners shall have paid any amount in respect of the costs hereof they shall be entitled to immediate reimbursement from the charterers of the sum so paid.

4.    **WE ALSO AWARD AND DIRECT** that the charterers shall pay the owners interest on the sums in paragraph 3 above at the rate of 4.50% (four and one-half per cent) per annum compounded at three-monthly intervals from the date hereof in the case of the owners' costs and from the date of any payment by the owners to us in respect of the costs hereof until, in each case, the date of payment by the charterers to the owners of the sums in question.

**GIVEN** under our hands this 14ᵗʰ day of October , 2009

....................................................
Bruce Harris

....................................................
Witness

....................................................
Patrick O'Donovan

....................................................
Witness

....................................................
Alan Oakley

....................................................
Witness

Amended in red (once, on page 1) pursuant to s.57 of The
Arbitration Act 1996, this 11th day of November 2009

**"JIN TONG" C/Ps dd 7.5.08 and 11.7.08**

**REASONS**
**for, and forming part of**

**FINAL AWARDS**

1.   "Jin Tong" was a newbuilding chartered by her disponent owners, Galsworthy Limited ("Galsworthy") to Glory Wealth Shipping Pte Ltd ("Glory Wealth") under a charter of 7 May 2008 for a minimum of 16 months to a maximum of 63 months.  Glory Wealth in turn sub-chartered her to Worldlink Shipping Limited ("Worldlink") by a charter dated 11 July 2008 for a period of a minimum 14 months, maximum 16 months.  Neither charter was performed, a fact which gave rise to these arbitrations. Whilst we have prepared one set of Reasons, many of the issues being common to both cases, we deal with each charter and the arguments raised under it in turn.

**Galsworthy/Glory Wealth Charter dated 7 May 2008**

2.   This was on the NPYE 1946 form and provided for hire at the rate of $35,500 daily including overtime.   Lines 18-19 of the charter provided:

> The vessel to be placed at the disposal of the Charterers, delivery ex yard Shanghai shipyard, any time day or night... Vessel's trading certificates including SNC/ISPS/CLASS P and I / etc likely available only after vessel's physical delivered from the shipyard.

3.   Clause 4 provided for the charterers to pay hire every 15 days in advance "commencing on and from the day and time of her delivery, as aforesaid", and clause 5 provided for the payment of that hire to be made in New York 15 days in advance.

4.    Typewritten additional clause 58 provided:

> Owners guarantee Certificate of Financial Responsibility is fully valid under this Charter period.  Any time lost or expense incurred through failure to do so to be for Owners' account.  The Master and the Owners shall be fully and financially responsible for all pollution caused by spillage or leakage unless pollution is caused by any act of negligence of Charterers or their servants.
>
> ...

5.    On 31 October 2008 at 1453 local time the master sent an email to Glory Wealth giving notice of delivery under the charter at 1212 hrs local time that day.  He attached to his email a delivery certificate and requested voyage instructions.  Shortly after that Galsworthy's agents emailed Glory Wealth's brokers advising of the delivery, attaching the master's delivery statement and also enclosing Galsworthy's first hire statement showing $683,237 as being due, whilst requesting Glory Wealth's remittance details by return.

6.    On 5 November, Glory Wealth advised Galsworthy through the broking/agency chain of the TT number covering their remittance of $683,237, and the following day Galsworthy confirmed receipt "of first hire from GWS".  Glory Wealth did not comment on that characterisation of their payment.

7.    On 10 November, Glory Wealth sent to Galsworthy through the broking/agency chain an email reading:

> Please see following received from head Charterers (Worldlink) which is deemed from us.

8.    And the message they passed on from Worldlink read:

> Charterers refer to the subject charter.  Regrettably, Owners have failed to provide the Certificate of Financial Responsibility as per the charterparty, chtrs have no alternative but to reject acceptance of this vessel.
>
> chtrs request owners to refund the money which chrtrs have paid to owners immediately, otherwise chrtrs will take action without any further notice.

9.    Galsworthy took the position that there was no need for a Certificate of Financial Responsibility ("COFR") to be on board the ship, that they guaranteed the validity of such certificate and that was supported by the P&I certificate and SIGCo guarantee. They also pointed out that if there was any delay or expenses caused by the absence of a relevant certificate those were to be for their account. They rejected any idea that Glory Wealth had the right to reject the ship, and pointed out that hire had been paid already.

10.   On 12 November Galsworthy invoiced the second instalment of hire which was due on 14 November, but that was not paid. Nor was the third instalment which fell due on 30 November. On 9 December, following messages from the owners requesting advice as to bunkering arrangements, Glory Wealth said:

> The vsl had been redelivered to owner already per our previous msg, pls owner arrange the same by themself.

11.   In response, Galsworthy said that they treated the message just referred to as a clear indication of Glory Wealth's refusal to perform the charter. Nevertheless they called on Glory Wealth to perform the charter and to confirm in writing that they would do so, but said that if they had not received such written confirmation by noon local time on 12 December they would treat Glory Wealth's conduct as repudiatory.

12.   Finally, on 17 December, Galsworthy accepted Glory Wealth's "refusal to perform their obligations... and insistence on early and premature redelivery" as being a repudiatory breach and therefore treated the charter as at an end.

13.   In this arbitration, Galsworthy originally claimed $1,114,406.82 in respect of hire outstanding up to 17 December 2008, plus

$63,149,175 by way of damages, representing the loss of earnings under the charter in question. In their Reply, however, they conceded that they were entitled to damages calculated by reference to the difference between the charterparty and market hire rates at or around the time of termination. Having fixed the ship on 2 January 2009 for a trip at a rate of $5,000, and then on 28 January fixed her for a period of 11 to 13 months at a rate of $10,000 per day, Galsworthy contended that the relevant market rate was $10,000 per day and claimed damages on that basis. Their revised damages figure, in final submissions, was $45,460,735.31.

14.   Glory Wealth denied liability. They said that the purported delivery by Galsworthy was ineffective because the ship was not fully fitted for the service in that, at the time of purported delivery, she had no COFR and indeed did not have one before 10 November. The original purported delivery having been ineffective, and Galsworthy having failed thereafter to purport to deliver the ship before the cancelling date, Glory Wealth were – they said – entitled to cancel the charter on 10 November, which they did.

15.   They said that the payment of $676,572.19 which they made was not in respect of the first instalment of hire, but was "a deposit on account of hire, bunkers on delivery and C/V/E".

16.   In the event that they were liable for damages, Glory Wealth said that the most that Galsworthy could recover would be limited to the difference between the rate of hire Galsworthy were paying under their charter with the head owners, and the rate payable under this charter; alternatively (as Galsworthy ultimately accepted) that damages would be limited to the difference between the market rate and the charter rate. Glory Wealth further contended that credit should be given in respect of any damages for accelerated payment at a rate which they said should be 50%.

17. Glory Wealth also advanced a counterclaim for the $676,572.19 which they had paid, as well as for damages of $10,250,625 being loss of profit which they contended they would have made under the charter with Worldlink but for what they contended was Galsworthy's breach.

18. We have no hesitation in rejecting Glory Wealth's case in respect of the COFR. In the first place, it seems to us that that certificate was one of those referred to in lines 18-19 of the charter, and thus the fact that it was not available on delivery could in no circumstances itself amount to a breach. Further, and in any event, on normal principles the absence of such a certificate could not entitle Glory Wealth to reject the ship (see *Chellew Navigation v. Appelquist* and *The Derby*). If there should be any doubt about this, it seems to us that it is put to rest by clause 58 of the charter which clearly anticipates and provides a remedy for the possibility that there may be times when the ship might not have a valid COFR. In those circumstances, the parties cannot possibly have intended that Glory Wealth should have the right to refuse delivery and/or terminate the charter in the absence of that certificate.

19. In forming this view, we have of course taken some account of the fact that the certificate in question would only be required for trading in the United States. As a matter of fact, Glory Wealth had at no time intimated any intention of trading the ship there (or anywhere else, as it happens).

20. We also have no hesitation in rejecting Glory Wealth's suggestion that the payment they made was not in respect of the first instalment of hire. We have not previously come across the concept of an "advance" in this context, and observe that as a matter of fact nothing was said at the time of or immediately after payment to suggest that it was other than in respect of the first instalment of hire.

5

21.    Glory Wealth were aware by no later than 3 November of the issue
       relating to the COFR, and yet two days later paid the first instalment
       of hire.  In those circumstances, if it were necessary to do so (which
       we do not consider it is) we would hold that Glory Wealth had in any
       event lost any right they might have had to reject the ship, since
       their making a payment in the light of the knowledge which they
       had was wholly inconsistent with any right to reject the ship and
       cancel the charter.

22.    For these brief reasons, it is plain that Glory Wealth in fact
       repudiated this charter and are accordingly liable in damages.  It
       must also follow that their counterclaim fails.

23.    The position of Glory Wealth in respect of Galsworthy's damages
       claim was first, as we have indicated, that the most that Galsworthy
       could recover would be the difference between the rate of hire
       Galsworthy were paying under their charter with the head owners,
       and the rate payable under this charter. We see no basis for that
       argument. Galsworthy are entitled to be put in the position they
       would have been in if Glory Wealth had not repudiated the charter.
       If it had been performed, they would have been paid hire under it.
       As it was, they had to employ the ship on the market. Their position
       vis-à-vis the registered owners is neither here nor there insofar as
       concerns the measure of loss they suffered.

24.    Glory Wealth then said that any enquiry as to market rates should
       be focussed on the date of termination of the charter, and at that
       date there was in effect no market for this ship for any period time
       charter beyond twelve months' duration.  This much, they said, was
       clear on Galsworthy's own expert evidence.  Alternatively, they said,
       a market rate of $12,000 per day should be taken.  In this respect
       they relied on an expert report which concluded that if the owners
       had taken action to find substitute employment earlier in November
       2008, when the ship was first rejected, it would have been possible

to secure a fixture at a higher rate than that which they obtained when she was in fact fixed in January 2009, and accordingly the owners had failed properly to mitigate.

25. In addition, if we were to find that there was a market for the ship for a replacement charter of a similar period to that covered by the present fixture, Glory Wealth said that Galsworthy's loss should be discounted to take account of the probabilities that there would have been periods of off-hire, that the ship would have run the usual risks of nautical life, including that of being lost at sea. They accordingly said that we should discount any damages by 50%.

26. However, whilst these points were put forward in final submissions, Glory Wealth did not plead any failure to mitigate during the course of the arbitration. Nor did they previously argue that Galsworthy should have accepted their repudiatory conduct (which they denied) earlier than in fact happened. Accordingly, we reject Glory Wealth's arguments on these bases, whilst observing that so far as we can see there was, in any event, nothing in them even if they had been pleaded and properly dealt with during the proceedings.

27. That leaves us with the question of what market rate we should take, it being accepted by Galsworthy that the appropriate time for assessing that rate was the date of termination, 17 December (or shortly thereafter since it is not always possible immediately to find substitute employment), and the question of the discount contended for by Glory Wealth.

28. The 11-13 months fixture obtained at the end of January 2009 at a rate of $10,000 per day, whilst not completely irrelevant, is only evidence as to the rate for a period charter of its particular duration, and does not directly assist in relation to the question what – if such a fixture were available – would have been the rate for a charter of the duration of that we have to consider.

29.  There was no solid evidence that, at the material times, there was in fact any market for a fixture of a comparable duration to the one that had been repudiated. However, Galsworthy drew our attention to and, in the alternative, relied upon evidence from Glory Wealth's expert to the effect that the market rate was "about US$10,750 to US$11,000 daily". This, Galsworthy said, was "largely consistent" with the rate of $10,000 they put forward.

30.  The burden was on Galsworthy to prove their damages. Doing the best we can on the material available to us, we think it right to assess the applicable market rate for an equivalent fixture at $11,000 daily.

31.  We see no basis in law or fact for the discounting exercise Glory Wealth urged upon us. No authority was cited (save as we mention in a moment) and no evidence was adduced to support the case put forward.

32.  The exception in relation to authority concerns an argument of restricted scope, i.e. that a discount should be applied for accelerated payment. For this, Glory Wealth relied upon a short passage in para. 4.38 of *Time Charters* (6th edn.) which says that in calculating what owners would have earned under the charter it is necessary to give "*credit for accelerated receipt if any of the unperformed period of the charter falls after the date when damages are being assessed*".

33.  Having regard to the period of this charter, we think it appropriate to discount, on this basis the damages that we would otherwise have awarded by 10%, and we have therefore awarded a final sum of $39,393,745.03 by way of damages, in addition to the hire claimed, making a total sum of $40,508,151.85. Glory Wealth must also bear the costs of this reference.

**Glory Wealth/Worldlink Charter dated 11 July 2008**

34. This too was on the NYPE form.  Whilst it contained the same provisions as in lines 18-19 and clause 58 of the Galsworthy/Glory Wealth charter (see above) it was, as already indicated, for a period of 14-16 months.  Further, the daily hire rate was $60,500, the market having risen considerably since the Galsworthy/Glory Wealth charter had been fixed.

35. At the same time as giving notice of delivery under the Galsworthy/Glory Wealth charter, the master gave a similar notice under the Glory Wealth/World Link charter. On 31 October Glory Wealth invoiced Worldlink for the first instalment of hire and bunkers in the sum of $1,106,804.44 which amount Worldlink promptly paid.

36. On 3 November Worldlink asked for a copy of the COFR, and later that day for a certificate of de-ratisation.  On 4 November, Glory Wealth passed to Worldlink a message received from Galsworthy to the effect that the owners would provide a copy of the COFR once it was available.

37. It was not until 10 November that Worldlink sent a message, through the broking chain, to Glory Wealth as set out in paragraph 8  above. They were then asked, on 12 and 21 November whether it was to be understood that they had terminated the charter, but failed to answer, and on 3 December Glory Wealth accepted Worldlink's conduct as being in repudiatory breach of the charter.

38. Glory Wealth claimed damages of $19,680,479 based on the difference between the charter rate and what they said was the market rate for an equivalent charter.  They gave credit for $1,061,429.44 net already paid, leaving a balance claimed of $18,619,046.56. Worldlink denied liability and counterclaimed the sum of $1,061,429.44 which they had paid.

39.  For the same reasons as we have given in respect of the head charter, we conclude without hesitation that Worldlink repudiated this charter (although the considerations relating to knowledge of the absence of a COFR before paying the hire do not apply in this instance, but that makes no difference).

40.  As in the other reference, Worldlink argued that damages should be assessed by reference to the difference between the hire rates payable under the head charter and this charter, but as in the other reference, we reject that submission.  The proper measure of damages is obtained by a comparison between the market rate and the charter rate.

41.  Worldlink also argued that we should take into account the fact, for which they contended, that as a result of proceedings for the winding-up or judicial management of Glory Wealth, there could be no prospect of them paying any, or the full amount of any "market related" damages to Galsworthy, and therefore any payment to Glory Wealth in excess of the difference between the rates of hire under the two charters would be a windfall to Glory Wealth, and the only order which might be appropriate in these circumstances would be one for a declaration.

42.  In our view, the financial situation of Glory Wealth is quite irrelevant to the measure of damages to which they are entitled. This case is, contrary to Worldlink's case, in no way comparable to *The Golden Victory*.  The question we have to decide is what loss have Glory Wealth suffered as a result of Worldlink's wrongful repudiation of the charter.  On the face of it, the answer to that is the normal measure of damages ascertained by reference to a comparison between the market rate and the charter rate. The intervention of financial difficulties on the part of Glory Wealth is neither here nor there.  For all we know, if Worldlink had honoured their obligations under this charter and paid the – rather handsome – rate of hire

they were obliged to pay, Glory Wealth might not have got into the difficulties they now face, but whether or not that is right does not seem to us to be relevant. Nor can it be of any significance – if it be the case – which is far from clear – that Glory Wealth will not pay some or all of the damages awarded to Galsworthy. In truth, the matters upon which Worldlink sought to rely in this respect are not matters that concern the parties to the fixture with which we are concerned: in former times they would be said to be *res inter alios acta*.

43. Accordingly we turn to consider the question of damages under this charter. As in the other reference, Worldlink sought to argue that the relevant date for assessment was not 3 December 2008 (when the repudiation was accepted) but somewhat earlier, namely 10 November when they in fact repudiated the charter. However, there was no pleaded case put forward, nor evidence to suggest, that Glory Wealth had no legitimate interest in maintaining the charter until they did accept the repudiation, or that there was any failure to mitigate, and we have no hesitation in concluding that the correct date is in fact 3 December.

44. On that basis Worldlink contended that the applicable market rate for a comparable charter should be $11,000 per day, and having regard to such evidence as is before us, we accept that figure. That produces a figure of $19,581,581.25. In this case, too, it was argued that a discount for accelerated payment should be applied. In this instance we think that the appropriate allowance is 2.5%. Further, credit must be given for the hire paid of $1,061,429.44. Accordingly the damages we award are in the sum of $18,030,612.28.

45. In light of our decision on liability, the counterclaim of course has to fail. It also follows that Worldlink must bear the costs.

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN ARBITRATION</u>

<u>BETWEEN:</u>

GALSWORTHY LIMITED
of Hong Kong

<u>Claimants</u>
(Owners)

and

GLORY WEALTH SHIPPING PTE LTD
of Singapore

<u>Respondents</u>
(Charterers)

<u>"JIN TONG" C/P dd 7.5.08</u>

<u>FINAL AWARD</u>

## ATTORNEY VERIFICATION

State of New York    )
                   ) ss.:
County of New York   )

MICHAEL E. UNGER, an attorney at law, duly admitted to practice in the Courts of the State of New York, affirms under penalty of perjury as follows:

1.     I am the attorney for the Plaintiff-Petitioner in this matter and have read the foregoing Verified Petition, know the contents thereof and upon information and belief, I believe the matters alleged therein to be true.

2.     The reason this Verification is made by me and not by the Plaintiff-Petitioner is that the Plaintiff-Petitioner resides in another state and none of its officers are present.

3.     The source of my information and the grounds for my belief are communications and documents received from the Plaintiff-Petitioner's solicitors.

_____
Michael E. Unger

Sworn to before me this
8th day of June, 2010

_____
NOTARY PUBLIC